IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA
AT BLUEFIELD

DAVID CRAFT,

         Plaintiff,

v.                              CIVIL ACTION NO. 1:23-00098

JOHN D. GILLS, et al.,

         Defendants.

## MEMORANDUM OPINION AND ORDER

Pending before the court is defendants' motion for summary judgment.  (ECF No. 33).  For the reasons explained below, the motion is **GRANTED** in part and **DENIED** in part.

### I.   Background

This case arises from an investigation by the West Virginia Division of Natural Resources ("DNR") into alleged unlawful hunting activities by plaintiff David Craft.  (See Compl. at ¶¶ 1-4, ECF No. 1).  Craft brings claims under 42 U.S.C. § 1983 against defendant DNR Officers, alleging that they violated the Fourth Amendment to the United States Constitution by prosecuting him without probable cause and seizing deer antlers from him without a warrant.  (See id. at ¶¶ 35, 44).

On November 3, 2020, Craft killed a buck in McDowell County, West Virginia.  (See Craft Dep. Tr. at 11:21-13:5, ECF No. 33-10).  He was a North Carolina resident but possessed a

valid West Virginia hunting license.  (See DNR Officer John
Gills Dep. Tr. at ¶¶ 30:5-14, ECF No. 33-8).  He killed a second
buck later that month on November 23.  (See Craft Dep. Tr. at
28:6-7, ECF No. 33-10).  He says he killed this one near his
hometown of Statesville, North Carlina, after leaving a bear
hunting trip in McDowell County at approximately 5:00 a.m. that
day.  (See id. at 31:5-12).  He checked this deer into North
Carolina's wildlife management database the next day.  (See ECF
No. 33-5 at 5).

Defendant DNR Officer John Gills believes both deer were
killed illegally in West Virginia.  (See Gills Dep. Tr. at
20:10-17, ECF No. 33-8).  He says Craft killed them on private
property in McDowell County, without the permission of the
landowner or lessee of the property, the Wolf Pen Hunt Club.
(Id. at 23:8-10).  This would violate West Virginia Code § 20-2-
7(a) (2010), which makes it a criminal offense to hunt on
private land without the permission of the landowner or tenant
of the landowner.  Gills says Craft killed both deer with a
crossbow and did not have a license permitting the use of a
crossbow, in violation of West Virginia Code § 20-2-42w (2020).
Additionally, Gills says that Craft killed the second buck in
McDowell County, despite the first buck satisfying his season
"bag limit" for that county, in violation of West Virginia Code

§ 20-1-17(b)(7) (2020) and West Virginia Code of State Rules § 58-50-3.

Gills learned of these alleged violations on December 8, 2020, when his sergeant relayed a complaint that he had received from an informant who claimed that he learned from Craft's cousin, Roger Craft, that Craft killed the deer on the Wolf Pen Hunt Club's property with a crossbow. (See Gills Dep. Tr. at 29:22-30:1, 103:12-23, ECF No. 33-8). Gills spoke with the property manager for the Wolf Pen Hunt Club, who informed him that he had seen two people hunting on the property without permission. (See id. at 21:14-17, 24:10-18). The property manager told Gills that he posted a note on a log advising them not to hunt on the property. (See id. at 104:17-105:9).

The property manager showed Gills trail-camera photos of two deer he believed were poached from the property. (See id. 37:18-38:1). One of the deer had a distinctive "kicker" feature on its antlers. (See id. at 130:5-7). Gills visited the site within the Wolf Pen Hunt Club property where members said the deer were killed, and Gills found evidence that a deer had been killed there. (See id. at 33:3-34:13). Next he contacted North Carolina DNR officers who informed him that Craft had checked a deer into North Carolina's wildlife management system around the time he had allegedly killed the second buck in McDowell County, and Gills believed the deer matched the description of the one

the hunt club members showed him.  (See id. at 41:4-13).  Gills
then contacted the person who rented a home to Craft when he
hunted, confirming that Craft was in McDowell County on the
alleged dates.  (See id. at 39:12-40:3).

Based on the information he had gathered to this point,
Gills made an official request for assistance to the North
Carolina DNR, and on February 8, 2021, he traveled to
Statesville with defendant Andy Damewood, a fellow West Virginia
DNR officer, to question Craft.  (See id. at 46:23-47:1-3).
Gills had another DNR officer, G.W. Wood, remain in McDowell
County to execute a search warrant at the home of Craft's
cousin, whom the informant said helped Craft process the
illegally killed deer.  (See id. at 44:1-24, 47:4-21).  Gills
planned to have the search warrant executed at the time he
questioned Craft to prevent him or his cousin from alerting each
other of the investigation.  (See id. at 47:17-48:14).

When Gills and Damewood arrived in Statesville, they met
with North Carolina DNR officers and briefed them about the
case.  (See id. at 54:1-55:5).  Gills and Damewood went to
Craft's house with the North Carolina officers and spoke to him
in his driveway.  (See id. at 58:4-60:6).  Craft showed Gills a
picture of the deer he says he killed in North Carolina, and
Gills says it was the same deer shown in the Wolf Pen Hunt Club
pictures.  (See id. at 61:6-11).

While the officers questioned Craft in North Carolina, Wood executed the search warrant in McDowell County.  (See id. 68:5-7).  Wood relayed to Gills the information he gathered from Craft's cousin.  (See id. at 68:8-12).  This included admissions in a recorded interview and text messages recovered from his phone.  (See id. at 75:24-76:1-3, 81:12-17).

Craft's cousin told Wood that Craft killed two bucks in McDowell County in November 2020 on a lease he thought he had permission to hunt on.  (See ECF No. 33-5 at 63-64).  He said that Craft probably used a crossbow.  (See id. at 62-63).  Craft's cousin also told Wood that he helped Craft drag the second deer out of the woods.  (See id. at 64).

Text messages recovered on Craft's cousin's cellphone were also revealing.  Craft texted the following to his cousin on the morning of November 21:

> Gonna have to deal with some bullshit when I get out of the woods this morning[.]  [A] hunting club le[f]t a log with posted signs and a note telling me to get my stuff out by today and the[y're] going to lock the gate going up the mountain[.] . . . They left a phone number.  Wolf p[e]n hunting club.  I'm gonna tell them they can get fucked[.]

(ECF No. 33-2 at 15).  Craft later texted his cousin and said "they can't legally make me leave [since] it [is] gas land and that remains public right[,]" to which his cousin responded, "[j]ust watch what you doing because they know the game wardens

and shit." (Id. at 18). Two days later, on November 23 at
10:30 a.m., Craft sent his cousin a picture of a buck that he
killed. (See ECF No. 33-3 at 11). When his cousin asked if he
was going to keep hunting, Craft replied "Heck no I got to get
out of here[.]" (See id. at 12). The cousin suggested that
Craft give the deer meat away to "[k]eep [Craft] from hauling it
back and shit . . . ." (Id. at 13).

Before Gills left Craft's home in North Carolina, Gills
issued Craft citations for hunting on private property without
the permission of the Wolf Pen Hunt Club, in violation of West
Virginia Code § 20-2-7(a), (ECF No. 33-5 at 68); hunting with a
crossbow without a license, in violation of West Virginia Code §
20-2-42w, (ECF No. 33-5 at 69); and exceeding his bag limit by
killing two deer in McDowell County, in violation of West
Virginia Code of State Rules § 58-50-3, (ECF No. 33-5 at 71).
Gills issued two other citations for related infractions. (See
id. at 67, 70).

Gills returned to West Virginia with two sets of deer
antlers and "capes" that Craft left with a taxidermist near his
home. (See Gills Dep. Tr. at 83:22-24, ECF No. 33-8). North
Carolina officers had seized the antlers and capes without a
warrant after Gills suggested to them that the antlers could be
DNA tested at West Virginia University to determine their state
of origin. (See id. at 71:18-73:17).

Gills sent the antlers off for DNA testing.  While the
results were pending, the McDowell County prosecutor requested
continuances of the criminal proceedings, and Craft says he
appeared for hearings in McDowell County.  (See Pl.'s Response
at 6, ECF No. 37).  On April 14, 2022, the results for one set
of antlers revealed that the deer came from West Virginia; the
results for the second set of antlers were inconclusive.  (See
Gills Dep. Tr. at 79:9-80:13, ECF No. 33-8).  Gills and the
McDowell County prosecutor agreed to dismiss the charges.  (See
ECF No. 37-4).  Gills returned the antlers to Craft after more
than a year in the state's possession.  (See Pl.'s Response at
6-7, ECF No. 37).

In their motion for summary judgment, defendants argue that
Craft was never seized, that they had probable cause to charge
him with the hunting violations, and that they are not liable
for the warrantless seizure of the antlers since North Carolina
officer took them from the taxidermist.

## II.  Legal Standard

Summary judgment is appropriate "if the movant shows that
there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law."  Fed. R.
Civ. P. 56(a).  A party that moves for summary judgment bears
the initial burden of demonstrating that no genuine issue of
material fact exists.  See Celotex Corp. v. Catrett, 477 U.S.

317, 323 (1986).  "A fact is 'material' if proof of its existence or non-existence would affect disposition of the case under applicable law.  An issue of material fact is 'genuine' if the evidence offered is such that a reasonable jury might return a verdict for the non-movant."  Sedar v. Reston Town Ctr. Prop., LLC, 988 F.3d 756, 761 (4th Cir. 2021) (quoting Wai Man Tom v. Hosp. Ventures LLC, 980 F.3d 1027, 1037 (4th Cir. 2020)).

Once the moving party establishes this initial burden, "the nonmoving party must then go beyond the pleadings and affidavits and show that there are 'specific facts showing that there is a genuine issue for trial.'"  Shaw v. Foreman, 59 F.4th 121, 129 (4th Cir. 2023) (quoting Celotex, 477 U.S. at 324).  To show a genuine issue for trial, the nonmoving party must present more than "[t]he mere existence of a scintilla of evidence[.]"  Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).  This means "conclusory allegations or denials, without more, are insufficient to preclude granting [a] summary judgment motion."  Id. (quoting Wai Man Tom, 980 F.3d at 1037).  "[T]he court need not consider 'unsupported assertions' or 'self-serving opinions without objective corroboration.'"  Mcdougald v. Kersey, 1:20CV666, 2022 WL 17578248, at *2 (S.D.W. Va. Aug. 16 2022) (quoting Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 962 (4th Cir. 1996)).

8

## II.  Discussion

As an initial matter, Craft agrees to voluntarily dismiss defendant Andy Damewood from this action.  (See Pl.'s Response at 14, ECF No. 37).  Therefore, the court will address only the claims against Gills.

Generally, in cases brought against a law-enforcement officer under 42 U.S.C. § 1983, courts must apply the demanding qualified immunity standard.  This requires a plaintiff to not only prove the violation of his or her constitutional rights, but also that those rights were clearly established at the time of the violation.  See Pearson v. Callahan, 555 U.S. 223, 232 (2009).  However, in this case, Gills only briefly mentions qualified immunity in the final paragraph of his twenty-four-page brief and does not address the second prong of the qualified immunity analysis.  (See Defs.' Mem. Supp. Summ. J. at 23-24, ECF No. 34).

This passing reference to qualified immunity is insufficient.  "The Fourth Circuit has stated that the defense of qualified immunity should be 'raised . . . distinct[ly] from the question of whether a constitutional violation occurred.'" Cantrell v. Frame, No. 2:18-cv-01106, 2019 WL 1234335, at *2 (S.D.W. Va. Mar. 18, 2019) (quoting Buffington v. Baltimore Cty., Md., 913 F.2d 113, 122 (4th Cir. 1990)).  Courts are not required to address the clearly established prong when a "brief

mentions qualified immunity for the officer-defendants, but hinges the argument wholly on the lack of a constitutional violation . . . ." Buffington, 913 F.2d at 122. For this reason, the court will consider only whether Gills violated Craft's constitutional rights, not whether Gills is entitled to qualified immunity.

Craft asserts two Fourth Amendment claims: malicious prosecution and unlawful seizure of evidence.

A.    **Malicious Prosecution**

Technically, "there is no such thing as a '§ 1983 malicious prosecution' claim." Lambert v. Williams, 223 F.3d 257, 262 (4th Cir. 2000). "What has been termed a 'malicious prosecution' claim in other cases 'is simply a claim founded on a Fourth Amendment seizure that incorporates elements of the analogous common law tort of malicious prosecution . . . ." Butler v. Genda, No. 505CV00039, 2006 WL 314541, *3 (W.D. Va. Feb. 9, 2006). The elements of the claim are well established: "To state a constitutional claim for malicious prosecution, 'a plaintiff must allege that the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor.'" Adams v. Cty. of Lexington, No. 8:20-4296-MGL-PJG, 2022 WL 21747956, at *4 (D.S.C. May 19, 2022) (quoting Evans v. Chalmers, 703 F.3d 636, 647 (4th Cir. 2012)). "The

10

constitutional violation alleged in such a suit is a type of unreasonable seizure—an arrest and detention of a person based on a criminal charge lacking probable cause." Chiaverini v. City of Napoleon, 602 U.S. 556, 562 (2024).

Gills argues that Craft was not seized and that, regardless, probable cause supported the charges against him.

### 1. Seizure

To implicate the Fourth Amendment, a plaintiff must show that he or she was seized. See Vansandt v. Passmore, No. 15-CV-620-JED-FHM, 2016 WL 5107020, at *4 (N.D. Okla. Sept. 20, 2016) (citing Albright v. Oliver, 510 U.S. 266, 271 (1994)). For that reason, "[a] groundless charging decision may abuse the criminal process, but it does not, in and of itself, violate the Fourth Amendment absent a significant restriction on liberty." Id. (quoting Becker v. Kroll, 494 F.3d 904, 914 (10th Cir. 2007)). The seizure must be instituted "pursuant to legal process." Warren v. Montgomery Cty., No. PJM 09-2510, 2012 WL 3779165, at *4 (D. Md. Aug. 30, 2012). "In this context, legal process ordinarily takes 'the form of an arrest warrant (in which case the arrest would constitute the seizure) or a subsequent charging document (in which case the sum of post-arraignment deprivations would comprise the seizure).'" Id. (quoting Nieves v. McSweeney, 241 F.3d 46, 54 (1st Cir. 2001)). "[T]he issuance of a citation, even under threat of jail if not accepted, does

not rise to the level of a Fourth Amendment seizure . . . ."
Martinez v. Carr, 479 F.3d 1292, 1299 (10th Cir. 2007).

In this case, Craft was not arrested or detained, and the
issuance of citations in his driveway was not a seizure.
Therefore, he must show "some post-arraignment deprivation of
liberty, 'caused by the application of legal process,' that
rises to the level of a constitutional violation."  Id.
(quoting Nieves, 241 F.3d at 54).  This requires him to
establish "separate and distinct liberty deprivations as a
result of the criminal charges brought against h[im], other than
being obliged to appear in court, experiencing stress, or
feeling humiliated by the process."  Id. (citing Harrington v.
City of Nashua, 610 F.3d 24, 32 (1st Cir. 2010)).  Such
deprivations of liberty include being detained after initiation
of the criminal charges or having "onerous travel restrictions"
imposed as bond conditions.  See id. (citing Gallo v. City of
Philadelphia, 161 F.3d 217, 222-24 (3d Cir. 1998)).

Craft does not show how he was seized because of the legal
process.  (See Pl.'s Resp. at 10-11, ECF No. 37).  He implies
that the issuance of the citations and the court proceedings
against him are enough to establish a Fourth Amendment seizure.
(See id.).  This is not enough.  He offers no evidence that he
was detained, that he posted bond, or that bond conditions
imposed onerous travel restrictions on him.  (See id.).

Accordingly, he has failed to establish a deprivation of liberty amounting to a Fourth Amendment seizure.

### 2. Probable Cause

Even if Craft was seized when required to appear in court, the seizure was supported by probable cause.

In addition to showing he was seized, Craft must establish "the wrongful initiation of charges without probable cause . . . ." Chiaverini, 602 U.S. at 562 (quoting Thompson v. Clark, 596 U.S. 36, 43 (2022)). "Probable cause requires only 'the kind of fair probability on which reasonable and prudent people, not legal technicians,' would rely." United States v. Bolling, No. 2:21-00087, 2023 WL 5616188, at *8 (S.D.W. Va. Aug. 30, 2023) (quoting United States v. Jones, 952 F.3d 153, 158 (4th Cir. 2020)). Probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." Brown v. Lott, No. 21-6928, 2022 WL 2093849, at *1 (4th Cir. June 10, 2022) (quoting Illinois v. Gates, 462 U.S. 213, 243 n.13 (1983)).

To satisfy this standard, a suspect must merely engage in conduct that warrants suspicion. See United States v. Orozco, 41 F.4th 403, 407 (4th Cir. 2022) (quoting United States v. Gondres-Medrano, 3 F.4th 708, 713 n.1 (4th Cir. 2021)). For this reason, probable cause is "not a high bar." United States v. Blakeney, 949 F.3d 851, 859 (4th Cir. 2020). The "totality

of circumstances" and "common-sense conclusions about human

behavior" inform the analysis.  United States v. Jones, 952 F.3d

153, 158 (4th Cir. 2020).

The analysis is generally straightforward.  "Stripped to

its essence, the question to be answered is whether an

objectively reasonable police officer, placed in the

circumstances, had a reasonable ground for belief of guilt that

was particularized with respect to the person to be . . .

seized."  Harrington-Wall v. City of Monroe, No. 20-2132, 2022

WL 670874, at *2 (4th Cir. Mar. 7, 2022) (per curiam) (quoting

United States v. Humphries, 372 F.3d 653, 657-58 (4th Cir.

2004)).  Of note in this case, "[a] combination of tips from an

informant and first-hand corroborative observation of suspicious

activity will provide probable cause."  Carter v. Luciano, No.

2:22-cv-00230, 2023 WL 3956201, at *4 (S.D.W. Va. June 12, 2023)

(quoting United States v. McCraw, 920 F.2d 224, 227 (4th Cir.

1990)).  When there is no genuine dispute of historical fact,

"the court determines as a matter of law whether the facts

amount to probable cause."  R.M.B. v. Bedford Cty. Sch. Bd., 169

F. Supp. 3d 647, 654 (W.D. Va. 2016) (cleaned up) (quoting

Caldwell v. Green, 451 F. Supp. 2d 811, 818 (W.D. Va. 2006)).

Probable cause existed to believe that Craft committed the

charged violations.  After the informant alerted the DNR of

Craft's alleged violations, Gills pursued the tip and found

14

corroborating evidence.  He visited the Wolf Pen Hunt Club and found evidence that a deer had been killed where Craft allegedly hunted, which corroborated the statements of the informant and members of the hunt club.  Gills confirmed that Craft had been in McDowell County on the alleged dates and that Craft had checked a buck into the North Carolina database the day after he allegedly killed the second buck in McDowell County.  This evidence alone supported a search warrant for Craft's cousin's house in McDowell County.  Yet, the most incriminating evidence would come from the execution of that warrant.

Craft's cousin told Wood that Craft killed two deer in McDowell County that hunting season, indicated that the deer were killed on the property leased by the Wolf Pen Hunt Club, and stated that Craft probably used a crossbow.  Craft's cousin also admitted that he helped Craft drag the second deer out of the woods.  He made these statements while law enforcement officers executed a search warrant at his home for his alleged involvement in the criminal activity.  Therefore, the statements are entitled to heightened credibility and alone support a finding of probable cause:  "Admissions of crime, like admissions against proprietary interests, carry their own indicia of credibility—sufficient at least to support a finding of probable cause . . . ."  United States v. Sweeney, No.

1:08CR77, 2009 WL 441442, at *3 (N.D.W. Va. Feb. 20, 2009)

(quoting <u>United States v. Harris</u>, 403 U.S. 573, 583 (1971)).

    The text messages recovered on Craft's cousin's phone also
support a finding of probable cause.  Craft acknowledged receipt
of the Wolf Pen Hunt Club's letter, which corroborated the
information DNR officers had received from the informant,
members of the hunt club, and Craft's cousin.  The messages also
revealed Craft's and his cousin's guilty consciences.  Craft's
cousin advised Craft to look out for DNR officers after Craft
informed him of the Wolf Pen Hunt Club's letter.  His cousin
also suggested a way for Craft to avoid hauling the meat back
after he learned Craft killed the second buck.  Similarly, when
asked whether he was going to keep hunting, Craft expressed his
need to "get out of here."  This would raise the suspicion of
reasonable officers under the circumstances.  <u>See District of
Columbia v. Wesby</u>, 583 U.S. 48, 59 (2018) (considering evidence
of guilty conscience as "'suspicious behavior' that factors into
the totality of the circumstances.").  Officers also saw a
picture of the dead buck that Craft sent his cousin at 10:30
a.m. on November 23, which is suspicious given the undisputed
evidence that Craft was in McDowell County that morning.

    Craft and his cousin have tried to walk back his
incriminating statements and their text messages.  Craft, in his
deposition, admitted that his cousin told Officer Wood that

16

Craft killed the second buck in McDowell County.  (See Craft
Dep. Tr. at 81:1-91:12, ECF No. 33-10).  However, Craft
testified that he jokingly misled his cousin into believing that
he killed the buck there.  (See id.).  This does not matter.
"[W]hether the substance of the information known to the officer
is *actually true* is . . . irrelevant; all the court need decide
is 'whether the officer had probable cause to *believe*' that the
person committed a crime."  Benn v. Kissane, 510 F. App'x 34,
36-37 (2d Cir. 2013) (quoting Maryland v. Pringle, 540 U.S. 366,
370 (2003)).  It is undisputed that Craft's cousin told Wood
that Craft killed the second buck in McDowell County.  This
established probable cause that Craft exceeded his bag limit for
the county.

    Craft's cousin changed his statements in his deposition.
He testified that he does not recall how many deer Craft killed
in McDowell County that hunting season and that the deer he
helped Craft with was not on the Wolf Pen Hunt Club's lease.
(See Roger Craft Dep. Tr. at 15:9-22, ECF No. 33-11).  This
changed statement does not affect the probable cause analysis,
either.  The court is concerned only with what Gills knew at the
time of the alleged seizure.  There is no evidence that Craft's
cousin recanted his statements before this lawsuit, and even if
he had, it would be immaterial to the probable cause
determination because "[p]olice officers are constantly faced

17

with reluctant witnesses and recanted confessions.  Yet they are not required 'to use the rules for summary judgment and draw inferences in favor of the suspects.'" <u>Coleman v. City of Peoria</u>, 925 F.3d 336, 351 (7th Cir. 2019) (quoting <u>Bridewell v. Eberle</u>, 730 F.3d 672, 676 (7th Cir. 2013)).  Therefore, Craft's cousin's statements established probable cause.

Craft argues that the text messages should not inform the probable cause analysis because they "were not utilized as evidence in the underlying criminal prosecution, nor were they even disclosed in discovery during the criminal prosecution." (Pl.'s Resp. at 11, ECF No. 37).  The court rejects this argument.

It is immaterial whether the text messages were used in the prosecution.  Probable cause is to be "considered in light of all information available to [officers] at the time of the [seizure] . . . ." <u>Mason v. City of Indianapolis</u>, No. 1:06-cv-258-RLY-TAB, 2007 WL 2700193, at *4 (S.D. Ind. Sept. 11, 2007) (quoting <u>Edwards v. Cabrera</u>, 58 F.3d 290, 292 (7th Cir. 1995)).  It is undisputed that the officers had the information while charges pended against Craft.  Gills produced the text messages in this case.  Craft admits that DNR officers "went all through" his cousin's phone.  (Craft Dep. Tr. at 68:10, ECF No. 33-10).  His cousin testified to the same thing.  He says that when officers executed the search warrant at his home, "[t]he guy had

18

my phone.  I don't know if he took text messages or what.  They said they had the subpoena or a search warrant for my phones and my house and my kids' phones and everything."  (Roger Craft Dep. Tr. at 10:11-15, ECF No. 33-11).  Therefore, the text messages are included in the totality of the circumstances available to the officers at the time of the alleged seizure.

Craft also argues that the text messages were not "obtained by [Gills], allegedly, until after he had already cited plaintiff in North Carolina."  (Pl.'s Resp. at 11, ECF No. 37). Craft offers no evidence in support of this statement.  The only evidence is Gills's testimony that Wood sent him pictures of the text messages while Gills interviewed Craft in North Carolina. (See Gills Dep. Tr. at 81:5-11, ECF No. 33-8).  Therefore, the fact is undisputed.  It is also beside the point.  There is no valid argument that Craft was seized when issued citations, and there is no genuine dispute that Gills had the text messages by the time Craft allegedly appeared in court.

Gills had probable cause to charge Craft with the alleged hunting violations.  Because he also was not seized within the meaning of the Fourth Amendment, Gills's motion for summary judgment is granted as to this claim.

**B. Unlawful Seizure of Evidence**

Gills also moves for summary judgment on Craft's claim that Gills unlawfully seized his deer antlers from the taxidermist. Gills argues that "[t]here is not even a shred of evidence that [d]efendants asked or otherwise solicited [the North Carolina DNR officers] to seize the antlers, while there is ample evidence that they did not."  (Def.'s Mem. Supp. Summ. J. at 23, ECF No. 34).  This argument fails.

A reasonable jury could infer that the North Carolina officers acted at Gills's request when they seized the antlers. Gills testified that he "advised the North Carolina officers that we had a DNA testing facility at WVU that we could test them at.  They sent one of their officers to the taxidermy shop." (Gills Dep. Tr. 68:24-69:3, ECF No. 33-8).  Gills then returned to West Virginia with the seized antlers and they remained in police custody for more than a year.  (See ECF No. 33-5).

This is sufficient to establish Gills's personal involvement in the alleged seizure of evidence.  While one cannot be vicariously liable for a § 1983 claim, one is liable if he or she plays an "affirmative part" in an alleged violation.  See Williams v. Rider, No. 1:12-cv-1566, 2014 WL 3881624, at *4 (M.D. Pa. Aug. 7, 2014) (citing Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988)).  "Thus, a §

20

1983 claim requires factual detail about each defendant's personal involvement." Duncan v. Lee, No. 7:20cv00554, 2020 WL 6875038, at *1 (W.D. Va. Nov. 23, 2020) (citing Wilcox v. Brown, 877 F.3d 161, 170 (4th Cir. 2017)).

The jury could also find Gills's personal involvement because of how long he retained the antlers after the initial warrantless seizure. "The Fourth Amendment regulates all such interference, and not merely the initial acquisition of possession." Mom's Inc. v. Willman, 109 F. App'x 629, 637 (4th Cir. 2004) (per curiam) (citing United States v. Place, 462 U.S. 696, 706 (1983)). Defendants' motion for summary judgment is denied as to this claim.

### IV.  Conclusion

For the above reasons, defendants' motion for summary judgment (ECF No. 33) is **GRANTED** in part as to plaintiff's malicious prosecution claim and **DENIED** in part as to his unlawful seizure of evidence claim. Defendant Andy Damewood is voluntarily **DISMISSED** from the action.

Defendants' motion to exceed the page limit (ECF No. 32) for their memorandum in support of their motion for summary judgment is **GRANTED**. Plaintiff's motion to extend the filing deadline (ECF No. 35) for his response to defendants' motion for summary judgment is **GRANTED**.

The Clerk is directed to send a copy of this Memorandum Opinion and Order to counsel of record.

**IT IS SO ORDERED** this 4th day of December, 2024.

ENTER:

David A. Faber
Senior United States District Judge